**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James G. Sego, ) | No.CV-05-1822-PHX-MHM |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| Geneva Aviation, Inc., a Delaware ) corporation; American Eurocopter ) corporation, a Delaware corporation; ) Eurocopter S.A. a foreign corporation. ) | |
| ) | |
| Defendants. ) | |

Currently before the Court is Defendant American Eurocopter corporation's ("AEC") Motion to dismiss (Dkt.#10) and Defendant Eurocopter S.A. corporation's ("Eurocopter") Motion to dismiss (Dkt.#29) Plaintiff James G. Sego's ("Plaintiff") Complaint. Both motions cite lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) as the basis for dismissal. The Court will also address Plaintiff's Motion for contingent discovery. (Dkt#33). After reviewing the pleadings and holding oral argument on March 21, 2006, the Court issues the following Order.

**I.     Background**

On July 1, 2004, Plaintiff was seriously injured in a helicopter crash in Scottsdale, Arizona while employed as a mechanic by Westcor. (Complaint ("Compl.") ¶'s 14, 15). The helicopter involved in the crash ("subject helicopter"), model AS-350-B2 bearing identification number N513-TS and serial number 2664, was manufactured and designed by

1  Eurocopter. (Compl.¶'s 8,13; Plaintiff's Supplemental Submission of Documents, Dkt#34,
2  West 001). This model of helicopter, AS-350-B2, incorporates a collective lock mechanism
3  utilizing a metal strap. (Compl. ¶17). According to Plaintiff, the use and design of the
4  subject helicopter's collective lock mechanism rendered the helicopter unreasonably
5  dangerous and defective. (Id. ¶17). Specifically, at a point during a maintenance check
6  flight by Plaintiff, the collective lock mechanism became engaged and could not be
7  disengaged, thus causing the subject helicopter to make a hard landing resulting in the
8  destruction of the helicopter and Plaintiff's injuries. (Id. ¶15).

9  The subject helicopter was manufactured by Eurocopter in 1992 in France and was first
10 registered in Sweden on August 28, 1992. (AEC's Motion, Dkt.#10, Exhibit C to Stephen
11 Yost Declaration). On October 1992, the helicopter was registered to a British purchaser,
12 Beacon Energy Ltd., in the United Kingdom. (Id., Exhibit D to Stephen Yost Decl.). In June
13 1997, the helicopter was de-registered in the United Kingdom and transferred by Beacon
14 Energy to the United States. (Id). After arriving in the United States the helicopter was sold
15 to Aviation Consultants of Aspen, Inc., in Hollis, New Hampshire, who in turn sold the
16 helicopter to Schuff Aviation Inc., located in Scottsdale, Arizona in 1997. (Id). In October
17 of 2003, Schuff Aviation sold the helicopter to Plaintiff's employer, Westcor, also located in
18 Scottsdale, Arizona. (Id).

19 AEC is a Delaware corporation with its principal place of business in Texas. (Compl. ¶3).
20 AEC is an independent subsidiary of Eurocopter and provides operators and owners of
21 Eurocopter helicopters with updated maintenance and operation manuals, service bulletins,
22 warnings, and other materials for Eurocopter helicopters located throughout the United
23 States. (Id. ¶7; Eurocopter's Reply, Dkt#36, Declaration of Kevin Cabaniss, ¶5). Westcor
24 is an AEC approved work service center, and Plaintiff frequently purchased parts through
25 AEC for installation on Eurocopter manufactured helicopters. (Plaintiff's Response,
26 Dkt.#17, Plaintiff's Affidavit at ¶8-10). AEC also sold parts and transacted business with
27 Westcor regarding maintenance on the subject helicopter after its arrival in Arizona in 1997.
28 (Compl. ¶7; Plaintiff's Supplemental Submission of Documents, Dkt#34, Docs. 1-52).

Moreover, Plaintiff ordered directly from AEC the "replacement parts associated with the collective lock mechanism" that is alleged to have caused the accident.(Plaintiff's Response, Dkt.#17, Plaintiff's Affidavit, ¶19-22). Plaintiff ordered these replacement parts from AEC after receiving Eurocopter's "Alert Service Bulletin," dated September 25, 2003, regarding "mandatory" maintenance on the collective lock mechanism of Eurocopter helicopters. (Id. at ¶18-22). AEC distributed the "Alert Service Bulletin" to Plaintiff's employer, Westcor. (Plaintiff's Response, Dkt.#31, Plaintiff's Affidavit ¶5). After ordering the relevant parts of the collective lock mechanism from AEC and receiving delivery, Plaintiff installed them on the subject helicopter. (Plaintiff's Response, Dkt.#17, Plaintiff's Affidavit ¶22 ).

Eurocopter is a "foreign business entity thought to be a corporation under the laws of France." (Compl. ¶4). It is involved in the design, manufacturing, assembly, and distribution of helicopters internationally. (Id. ¶8). Within the United States, Eurocopter uses its independent subsidiary, AEC, to provide owner/operators of Eurocopter helicopters with updated maintenance and operation manuals, service bulletins and replacement parts for Eurocopter helicopters. (Id. ¶7, Plaintiff's Response, Dkt#17, Plaintiff's Affidavit ¶9, 12). In May of 2002, Plaintiff took delivery of a Eurocopter helicopter directly from Eurocopter and delivered payment of $1,800,000 directly to Eurocopter. (Plaintiff's Response, Dkt.#31, Plaintiff's Affidavit ¶4). Upon taking delivery, Plaintiff informed Eurocopter of the helicopter's future location in Arizona and Plaintiff's employment with an Arizona consumer. (Id). Eurocopter authored a letter on May 22, 2002, acknowledging Plaintiff's arrival for pickup of the helicopter for the use of his company. (Id.¶4, Exhibit 3). Eurocopter also inquired directly regarding parts on the subject helicopter with Westcor after the subject helicopter arrived in Arizona. (Id. at ¶2). On September 25, 2003, Eurocopter issued the above mentioned "Alert Service Bulletin," distributed by AEC, to Eurocopter owners in the United States, including Arizona, describing recommended "mandatory" maintenance to be performed on the "collective lever lock" of Eurocopter helicopters. (Plaintiff's Response, Dkt.#17, Exhibit 1 to Plaintiff's Affidavit). The "Alert Service Bulletin" directed helicopter owners to perform some of the recommended maintenance

within 50 flying hours and that the replacement parts were to be purchased directly from Eurocopter. (Id.).

On June 16, 2005, Plaintiff asserted the present action against these Defendants alleging negligence and strict products liability. The Court's jurisdiction is based upon diversity. Both Defendant AEC and Eurocopter move to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) Fed.R.Civ.P.

**II.     Standard of Review**

To establish personal jurisdiction, plaintiff has the burden of showing that: (1) the forum state's long-arm statute confers jurisdiction over the nonresident defendant; and (2) the exercise of jurisdiction comports with principles of due process. Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 269 (9th Cir. 1995). Arizona's long-arm statute confers jurisdiction to the maximum extent allowed by the Due Process Clause of the United States Constitution. Ariz.R.Civ.P. 4.2(a) (2004); Doe v. American Nat'l Red Cross, 112 F.3d 1048, 1050 (9th Cir. 1997). Therefore, the only issue here is whether the exercise of jurisdiction over Defendants accords with due process. See Omeluk, 52 F.3d at 269.

Where an evidentiary hearing is not held, dismissal for lack of personal jurisdiction is appropriate only if the plaintiff has not made a prima facie showing of personal jurisdiction. Fields v. Sedgwick Associated Risks, Ltd., 796 F.2d 299, 300 (9th Cir. 1986). "[U]ncontroverted allegations in [plaintiff's] complaint must be taken as true, and "conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists."" American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996) (citing WNS, Inc. v. Farrow, 884 F.2d 200, 2003 (5th Cir. 1989). If the plaintiff is able to meet its prima facie burden, the movant can nevertheless continue to challenge personal jurisdiction either at a pretrial evidentiary hearing or at trial itself. Metropolitan Life Ins. Co. v. Neaves, 912 F.2d 1062, 1064, n.1 (9th Cir. 1990).

**III.    Discussion**

Due Process requires that the nonresident defendant have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal citation omitted). There are two types of personal jurisdiction, general and specific. General jurisdiction exists where a non-resident defendant engages in substantial, continuous or systematic activities within the forum. Perkins v. Benquet Consol. Mining, Co., 342 U.S. 437, 445, 72 S.Ct. 413 (1952). When a defendant's contacts with the forum do not rise to the level required for general jurisdiction, a court may exercise specific jurisdiction over a claim when it arises from the defendant's activities within that forum. Shute v. Carnival Cruise Lines, 897 F.2d 377, 381 (9th Cir. 1990) rev'd on other grounds, 499 U.S. 585, 111 S.Ct. 1522 (1991).

In the instant case, Plaintiff does not concede that general jurisdiction does not exist with respect to these non-resident Defendants, but rather argues that the Court need only look to specific jurisdiction. Therefore, the Court will first address the issue of specific jurisdiction and in the event that specific jurisdiction does exist over these Defendants a general jurisdiction evaluation will not be necessary. The Ninth Circuit utilizes a three-prong test to evaluate the nature and quality of Defendant's contacts for purposes of specific jurisdiction; the test provides:

> 1) the nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections; 2) the claim must be one which arises out of or results from the defendant forum related activities; and 3) exercise of the jurisdiction must be reasonable.

EDIAS Software Intern., LLC v. BASIS Intern. Ltd., 947 F. Supp. 413, 417 (D. Ariz. 1996). All three factors must exist for personal jurisdiction to apply. Omeluk v. Langstein Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

**A.     Three-Prong Analysis Of Specific Jurisdiction**
       **(1) Purposeful Direction**

- 5 -

The first step of the relevant inquiry in determining if this Court may exercise personal jurisdiction over these Defendants is to determine if the Defendants have purposefully availed themselves of the privileges of conducting activities in Arizona. This requirement ensures that a defendant is not "haled into court as the result of random, fortuitous or attenuated contacts, or on account of the unilateral acts of third parties." Shute, 897 F.3d at 381. While the term "purposeful availment" is often used to include both purposeful availment and purposeful direction, a purposeful direction analysis is appropriate for tort claims, such as this. See Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 803 (9th Cir. 2004). Purposeful direction is generally found given "evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." Id. at 803; see also Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774-75, 104 S.Ct. 1473 (1984) (finding purposeful direction where defendant published magazines in Ohio and circulated them in the forum state of New Hampshire); Mattel, Inc., v. MCA Records, Inc., 296 F.3d 894, 899 (9th Cir. 2002) (finding purposeful direction where defendant distributed its pop music albums from Europe in the forum state, California).[1]

### (a) Purposeful Direction of AEC

Defendant AEC contends that this Court cannot exercise personal jurisdiction over it, because AEC does not have any contacts with Arizona that relate to Plaintiff's cause of action. Specifically, Defendant relies heavily on the fact that the subject helicopter took an indirect route to its ultimate destination in Arizona and did not in any way involve AEC. (AEC's Motion, Dkt.#10, Exhibit C and D to Stephen Yost Declaration). While it appears clear that the subject helicopter ended up in Arizona on a random path without intervention

---

[1] The "effects test" of the purposeful direction inquiry is not used in this case, as it typically applied in intentional tort cases. Here, Plaintiff's claims arise out of negligence and strict products liability. See Rosenberg v. Seattle Art Museum, 42 F. Supp.2d 1029, 1037, n. 8 (W.D. Wash. 1999) (noting that only an intentional tort, not a negligent tort, can satisfy the Ninth Circuit's effects test).

- 6 -

of Defendant AEC or Eurocopter, this is not dispositive of the issue.[2]  Importantly, there appear to be other significant activities directed towards Arizona by AEC and even activities in Arizona directed toward the subject helicopter.  For instance, Plaintiff's Complaint and affidavits relate that Plaintiff, on behalf of Westcor, an AEC service provider in Arizona, frequently ordered various parts directly from AEC for Eurocopter helicopters (Plaintiff's Response, Dkt.#17, Plaintiff's Affidavit ¶10).  Additionally, Plaintiff offers numerous documents demonstrating direct transactions between AEC and Eurocopter regarding work performed on the subject helicopter after its arrival in Arizona in 1997. (Plaintiff's Supplemental Submission of Documents, Dkt#34, Docs. 1-52).[3]  Plaintiff also alleges that he periodically received "updated maintenance and operation manuals, service bulletins, warnings and other material" from AEC regarding Eurocopter helicopters.. (Compl.¶7, Plaintiff's Response, Dkt.#17, Plaintiff's Affidavit ¶ 5,16).   Lastly, and perhaps most notably, Plaintiff provides his affidavit stating that after receiving Eurocopter's "Alert Service Bulletin," via delivery of AEC, regarding the maintenance to be performed on the collective lock mechanism, Plaintiff ordered directly from AEC the applicable collective lock mechanism part(s) and installed them on the subject helicopter. (Plaintiff's Response, Dkt.#17, Plaintiff's Affidavit. ¶¶19-22).[4]  Sometime after installing the collective lock

---

[2] Defendants attach the ruling by the Honorable John W. Sedwick in another case from this District, CV02-1073-PHX-JWS, involving a separate helicopter crash of a Eurocopter helicopter in Arizona.  In that case Judge Sedwick dismissed Defendant Eurocopter and found the court lacked specific jurisdiction based in part on the random and un-deliberate path the accident helicopter took in traveling to Arizona as well as Plaintiff's inability to satisfy the "arising out of" requirement discussed below.  Obviously, Judge Sedwick's ruling is not binding on this Court; however the Court will review the ruling as any other case from this District.

[3] This is a distinguishing factor from Judge Sedwick's ruling in which it appears that Eurocopter was not even aware that the subject helicopter was in Arizona. (CIV-02-1073-PHX-JWS, Dkt.#201, p. 19).

[4] AEC contends that the statement from Plaintiff regarding the purchase of the collective lock mechanism part is not persuasive as it is unclear from Plaintiff's statement whether the parts he ordered from AEC were in fact the parts that he used in maintenance and

- 7 -

1  mechanism parts received from AEC, the subject helicopter crashed and it is alleged that the
2  collective lock mechanism was the cause of the accident. (Compl. ¶15).

3  Thus, the documented history of the transactions involving the maintenance and sale of
4  parts between AEC and Westcor, the issuance of relevant materials such as operation
5  manuals and service bulletins regarding Eurocopter helicopters to Westcor, and activities
6  directed specifically at the subject helicopter while in Arizona demonstrate a history of
7  activities by AEC directed in Arizona. Thus, unlike the ruling made by Judge Sedwick in
8  CIV 02-1073, upon which AEC relies, there is a steady history of contacts in Arizona and
9  present awareness of the subject helicopter's location in Arizona. Thus, the purposeful
10 direction prong is satisfied with respect to AEC.

### (b) Purposeful Direction of Eurocopter

(i) Eurocopter's Direct Contacts With Arizona

There also appears to be a sufficient business history by Eurocopter directed toward Arizona as well. Similar to AEC, Eurocopter relies on the apparent fact that the subject helicopter arrived in Arizona on a random path and without any interaction between Eurocopter and any purchaser in Arizona. Moreover, Eurocopter asserts that Plaintiff's claims that he purchased parts from AEC and received materials from AEC prepared by Eurocopter demonstrate only that Eurocopter may have had contacts with Texas, not Arizona. However, the allegations, sworn statements and exhibits relate more than what Eurocopter concedes. For example, not mentioned by Eurocopter is that there appears to be a direct history of correspondence and business transacted in Arizona by Eurocopter with Westcor.

---

repair of the accident helicopter. However, a plain reading of Plaintiff's affidavit reveals that he ordered from AEC part #540A, the collective lock, and is "reasonably confident" he ordered another part involved in the collective lock system, part #560. (Plaintiff's Response, Dkt#17, Plaintiff's Affidavit ¶19). Moreover, he states that the parts he ordered were delivered to Westcor and he installed them on the subject helicopter. (Id. at 21-22).

- 8 -

1    For instance, Plaintiff provides his affidavit stating that in May of 2002, he personally
2  accepted delivery of another Eurocopter helicopter, on behalf of Westcor, in exchange of
3  payment of $1,800,000, at which time he related that the helicopter was to be used in
4  Arizona. (Plaintiff's Response, Dkt.#31, Plaintiff's Affidavit ¶ 4).  This transaction is
5  confirmed by a letter addressed in name to Plaintiff.  (Id., Exhibit 3).  This affidavit
6  demonstrates, at the very least, that Eurocopter was aware that it was transacting business
7  with an entity in the state of Arizona.  See Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191,
8  1195 (9th Cir. 1988) (stating "solicitation of business in the forum state that results in
9  business being transacted or contract negotiations will probably be considered purposeful
10 availment.").    Moreover, Plaintiff provides his sworn statement describing a document
11 received from Eurocopter inquiring into the status and condition of parts that were installed
12 on the subject helicopter involved in the accident sometime after its arrival in Arizona in
13 1997. (Id. at ¶3).  Such correspondence regarding the subject helicopter reveals more than
14 a blanket unawareness that the subject helicopter was in Arizona.  Thus, although the subject
15 helicopter may not have ended up in Arizona through direct actions of Eurocopter, there is
16 evidence that once the helicopter did arrive in Arizona, Eurocopter became aware of its
17 location and affirmed it by transacting business in Arizona as well as transacting business
18 with respect to the subject helicopter.

19    This is a distinguishing factor of the decision in Abraham v. Agusta, S.P.A., 968 F. Supp.
20 1403, 1410 (D. Nev. 1997), upon which Eurocopter relies.  Abraham involves a products
21 liability action asserted in Nevada district court, in which the district court held that it could
22 not exercise specific personal jurisdiction over the Texas corporation defendant.  Id.  The
23 court in Abraham observed that the Texas corporation defendant  sold the plane involved in
24 the accident to a Florida company who then owned and operated the plane for two years and
25 then sold the plane into the Nevada forum. Based upon these circumstances, the Texas
26 defendant had no reason to "foresee or expect" that the third-party would sell the plane to a
27 Nevada resident.  Id.   However, in the instant case, although Eurocopter may not have been
28 involved in the sale of the subject helicopter in the Arizona forum; there is evidence to

- 9 -

suggest that it affirmed its location by subsequently transacting business regarding the subject helicopter as well as other of its helicopters in Arizona. Thus, unlike <u>Abraham</u>, this case does not involve a blanket unawareness of involvement in the subject forum.

Lastly, it is relevant to note that based upon Eurocopter's awareness of the location of the subject helicopter and other Eurocopter helicopters in Arizona, it is reasonable to infer that when Eurocopter issued its "Alert Service Bulletin" on September 25, 2003, regarding the maintenance to be performed on its helicopters' collective lock mechanism that it was foreseeable that such action would impact Arizona, and more specifically, Westcor.

Thus, while Eurocopter may not have directed the sale of the subject helicopter in Arizona there is sufficient evidence demonstrating that Eurocopter directed other activities toward the state of Arizona, including activities involving the subject helicopter.

    (ii) <u>AEC's Activities Can Also Be Imputed To Eurocopter Under An Agency Theory.</u>

Alternatively, even if Eurocopter did not direct its activities to Arizona, it is reasonable that the contacts with Arizona mentioned above with respect to AEC may be imputed to Eurocopter, the parent of AEC. (See Eurocopter's Reply, Dkt.#36, Declaration of Kevin Cabaniss, ¶5). It is well established in the Ninth Circuit that a relationship between a parent company and its subsidiary is not sufficient to establish jurisdiction over the parent on the basis of the subsidiary's contacts with the forum. <u>Doe v. Unocal Corp</u>., 248 F.3d 915, 925 (9th Cir. 2001) (citing <u>Transure, Inc., v. Marsh and McLennan, Inc.</u>, 766 F.2d 1297, 1299 (9th Cir. 1985). However, "if the parent and subsidiary are not really separate entities, or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation." <u>Id.</u> (citing <u>El-Fadl v. Central Bank of Jordan</u>, 75 F.3d 668, 676 (D.C. Cir. 1996).

An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations. <u>Id.</u>  The test for application of the alter ego exception is a showing that (1) there is a unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities

- 10 -

would result in fraud or injustice. Id. (citing American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 591 (9th Cir. 1996). Here, Plaintiff makes no attempt to make such a showing, thus the alter ego theory provides no basis for personal jurisdiction over Eurocopter based upon the contacts of AEC.

The agency test is satisfied by a showing that the subsidiary functions as part of the parent corporation's representative in that it performs services that are "sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." Id. at 928 (citing Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994).[5] The court in Chan explained that "courts have permitted the imputation of contacts where the subsidiary was 'either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself." Chan, 39 F.3d at 1405 (citing Gallagher v. Mazda Motor of America, Inc. 781 F. Supp. 1079 (E.D. Pa. 1992). "The question to ask is ... whether in the truest sense, the subsidiaries' presence substitutes for the presence of the parent." Unocal Corp., 248 F.3d at 928-29 (9th Cir. 2001).

Here, it appears based upon Plaintiff's Complaint, affidavits and exhibits that AEC's activities toward Arizona can be attributed to Eurocopter through this theory. For instance, AEC is a subsidiary of, and distributor for Eurocopter in the United States and appears to perform a variety of functions for Eurocopter in this forum including the distribution of parts for maintenance on Eurocopter helicopters as well as the issuance of materials for Eurocopter owners regarding operation and service bulletins. (Complaint ¶7; Plaintiff's Response, Dkt.#17, Plaintiff's Affidavit at ¶8-10). If AEC did not perform these tasks for Eurocopter, then presumably Eurocopter would have to perform these activities itself to remain competitive in the United States market.

---

[5] See also Von Grabe v. Sprint PCS, 312 F. Supp.2d 1285, 1296 (S.D. Cal. 2003) (discussing application of specific jurisdiction to non-resident based upon parent-subsidiary, agency theory).

- 11 -

1  This notion is demonstrated in In re Nat'l Audit Defense Network, 332 B.R. 896, 905 (D. Nev. 2005). In Nat'l Audit, the district found specific jurisdiction over the non-resident parent corporation based upon agency principles. Id. at 905. The district court held that specific jurisdiction could be found against the non-resident defendant corporation, OPI, located in Montreal, Canada, based upon its relationship with its subsidiary, OPL, whom had contracted with the Nevada plaintiff. Id. Specifically, the district court imputed the activities of the principal, OPI, to those of its co-Defendant subsidiary OPL. The principal's activities in the forum involved internet support services for its subsidiaries, including OPL, which made up the majority of its business. Id. In this case, OPI was performing the services that OPL had contracted to perform in the forum. Id. The court concluded that the complaint fairly alleged that if OPL, the subsidiary, did not have OPI's services in Nevada and other states, then OPL would have to perform such services itself. Id. at 905-06. Therefore, specific jurisdiction attached to both the principal and the subsidiary. Id. at 906.

Nat'l Audit provides support for imputing the activities of AEC to Eurocopter in this case. Like Nat'l Audit, Plaintiff's Complaint fairly alleges and the accompanying affidavits and documents provide persuasive evidence of an agency relationship between the two defendants. For instance, AEC, acting as Eurocopter's American subsidiary appears to provide important functions for Eurocopter in the United States, including Arizona. Specifically, AEC distributes parts and operational materials to Eurocopter helicopter owners in the United States. Eurocopter would likely have to perform such functions itself in Arizona and other states if AEC did not perform such activities for Eurocopter. Thus, like Nat'l Audit, specific jurisdiction can attach based upon the activities of one of the parties involved in the agency relationship; here such activities are directed by AEC and can be imputed to Eurocopter. As such, even if Eurocopter did not direct activities to Arizona on its own accord, the activities of AEC can be imputed to Eurocopter as Plaintiff has made the requisite prima facie showing of an agency relationship between the two.

**(2) "Arising Out Of" Requirement**

1    The "arising out of" requirement is also referred to as the "but for" test. "[A] claim arises
2 out of the forum related activities if it would not have happened "but for" the forum related
3 activities." Shute v. Carnival Cruise Lines, 897 F.2d 377, 387 (9th Cir. 1990); *overruled on*
4 *other grounds*, 499 U.S. 585, 111 S.Ct. 1522 (1991).  The "but for" requirement is the "key
5 to exercising specific jurisdiction . . .[it] goes to the heart of minimum contacts and creates
6 the distinction between specific and general jurisdiction. Williams v. Lakeview, Co., 199
7 Ariz. 1, 4, 13 P.3d 280, 283 (2000).  The "but for" test was affirmed by the Ninth Circuit in
8 Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 271 (9th Cir. 1995); see also Doe
9 v. American Nat. Red Cross, 112 F.3d 1048, 1051 (9th Cir. 1997).

10   In Omeluk, plaintiff Omeluk was injured when a grate on the ship's deck gave way
11 ultimately causing plaintiff to fall overboard. Id. at 268-69.  The nonresident defendant, a
12 Norwegian corporation, had installed the welds on the defective grate.  However, the
13 defendant's contacts with the forum state were limited to in-state purchases and attendance
14 at the christening of the ship.  Further, although the defendant had performed work on the
15 subject ship, the work took place in Norway and the defendant was merely aware that "some
16 of the vessels it worked on may be in the United States." Id. at 269.  In applying the "but for"
17 test the court found that the test had not been met with respect to the non-resident defendant
18 because the defendant's contacts in the forum consisted of purchases of electronic equipment
19 and nets and attendance at the christening of the subject vessel, which had nothing to do with
20 the welds on the grate giving way. Id. at 272.   In applying the holding in Omeluk to the
21 present case it provides instructive distinguishing authority demonstrating that Defendants
22 AEC and Eurocopter possess the requisite "but for" relationship to the subject accident.

25              **(a) "Arising Out Of:" AEC**.
26   Unlike Omeluk, AEC's forum related activities appear to possess the requisite "but for"
27 relationship to the accident at issue.  Such activities include the Plaintiff's well documented
28 history of business transactions regarding parts and maintenance between AEC and Westcor

- 13 -

as well as AEC's distribution of "updated maintenance and operation manuals, service bulletins, warnings and other material." (Plaintiff's Supplemental Submission of Documents, Dkt#34, Docs. 1-52; Compl. ¶7). Moreover, AEC's activities involve the direct sale and distribution of the subject collective mechanism that is the alleged cause of the accident at issue in this case. (Plaintiff's Response, Dkt.#17, Plaintiff's Affidavit, ¶19-22). Thus, AEC's forum related activities appear to relate to the subject accident and arguably, "but for", AEC's activity of distributing the defective collective lock mechanism to Plaintiff, the subject accident would not have occurred. In other words, looking at the facts in the light most favorable to the Plaintiff, the crash would not have occurred had AEC not sold Plaintiff the defective collective lock mechanism parts that Plaintiff subsequently installed.

### (b) "Arising Out Of:" Eurocopter

The same is true with respect to Eurocopter. Plaintiff alleges that Eurocopter provided the manuals governing the maintenance of the subject collective lock mechanism. (Compl. ¶7). There is evidence of a direct dialogue between Plaintiff and Eurocopter regarding transactions in Arizona and the maintenance of the subject helicopter in Arizona. (Plaintiff's Response, Dkt.#31, Plaintiff's Affidavit ¶'s 2,4). Subsequent to the establishment of a dialogue between these parties, Eurocopter issued the "Alert Service Bulletin" advising "mandatory" maintenance to be performed on the collective lock mechanism of its helicopters and the parts to be ordered directly from it. (Plaintiff's Response, Dkt.#17, Exhibit 1 to Plaintiff's Affidavit). Subsequent to receiving this alert, Plaintiff ordered the relevant parts on the collective lock mechanism for the subject helicopter from AEC, Eurocopter's subsidiary. (Plaintiff's Response, Dkt#17, Plaintiff's Affidavit, ¶'s 17-25). Presumably AEC then supplied or ordered the relevant parts from Eurocopter, the manufacturer of the helicopter and the collective lock mechanism, and delivered them to Plaintiff. After allegedly properly installing the parts, the subject helicopter crashed. Thus, "but for" the Plaintiff's efforts to comply with the "Special Alert Bulletin" and receipt of defective parts manufactured by Eurocopter through its subsidiary, AEC, the accident may

1 not have occurred. As such, the requisite "but for" relationship exists between Eurocopter's
2 contacts in Arizona and the subject accident.

3 Alternatively, even if Eurocopter's direct activities do not satisfy the "but for" test; as
4 discussed above, the activities of AEC do satisfy this test as the direct distributor of the
5 defective parts manufactured by Eurocopter. Therefore, because there has been a prima facie
6 showing of any agency relationship between Eurocopter and AEC, AEC's activities may be
7 imputed to Eurocopter, thus satisfying the "but for" test against Eurocopter. See Nat'l Audit,
8 332 B.R. at 905 (noting that activities of the principal, OPI, "squarely satisfy the but-for test
9 in the paragraph above," thus satisfying this test against the subsidiary, OPL.).

10 **(3) Reasonableness**

11 For specific jurisdiction to be reasonable, "it must comport with fair play and substantial
12 justice." Bancroft, 223 F.3d at 1088 (quoting Burger King Corp v. Rudzewicz, 471 U.S. 462,
13 476, 105 S.Ct. 2174 (1985)). Several factors are to be considered in determining the
14 reasonableness of exercising specific jurisdiction: (1) the extent of the defendant's purposeful
15 interjection into the forum state; (2) the burden on the defendant in defending in the forum;
16 (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum
17 state's interest in adjudicating the dispute; (5) the most efficient use of judicial resolution of
18 the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and
19 effective relief; and (7) the existence of an alternative forum." Id. Procedurally, if
20 purposeful availment has been established, "the forum's exercise of jurisdiction is
21 presumptively reasonable. To rebut the presumption, a defendant 'must present a compelling
22 case' that the exercise of jurisdiction would, in fact, be unreasonable." Shute, 897 F.3d at
23 386 (quoting Burger King, 741 U.S. at 476).

24 Both AEC and Eurocopter offer the same basic argument in the hopes of demonstrating
25 that it would be unreasonable for jurisdiction to be maintained by this Court. Specifically,
26 that neither entity has purposefully interjected itself into Arizona regarding the subject
27 helicopter. However, as explained above, this Court finds that there is evidence
28 demonstrating the opposite conclusion. For example, AEC directly sold to Plaintiff the

- 15 -

1 subject collective lock mechanism that is alleged to be the cause of the accident. Moreover, 2 Eurocopter has communicated directly with Plaintiff with respect to sales of other helicopters 3 as well as with respect to the sale of parts on the subject helicopter. Eurocopter also issued 4 the "Alert Service Bulletin" regarding the "mandatory" maintenance to be performed on its 5 helicopters. Under such circumstances, there is substantial evidence of purposeful 6 interjection in Arizona. Further, it is well established that "a state is deemed to have a strong 7 interest in protecting its citizens against the tortious acts of others. Shute, 897 F.3d at 387. 8 In Arizona, "exercising jurisdiction over a manufacturer of defective and unreasonably 9 dangerous consumer products provides a forum for Arizona residents harmed by such 10 products and a deterrent to selling unreasonably dangerous products in the state." A. Uberti 11 & C v. Leonardo, 892 P.2d 1354, 1364 (Ariz. 1995).

12 Also, although it may cause a burden on the Defendants to defend in Arizona this factor 13 alone does not outweigh the state's interest. In light of the Defendants' contacts in Arizona 14 with respect to the subject helicopter and others, it is clearly foreseeable that the Defendants 15 could be subject to suit for any of its tortious activities in this forum. Moreover, this burden 16 may be minimized due to Defendants' having local counsel in Arizona. See Yahoo, Inc., v. 17 La Ligue Contre Le Racisme Et L'Antisemitisme 145 F. Supp.2d 1168, 1177-78 (N.D. Cal. 18 2001) (holding that burden upon French non-profit entity in defending suit in California did 19 not justify finding of unreasonableness in light of technology available); see also A.Uberti 20 and C, 181 Ariz. at 575-76 (stating that burden on Italian manufacturer in defending product 21 liability suit in Arizona was not outweighed by state's interest as well as the technology 22 available).

23 Further, although this Court gives due deference to the laws of France, it is equally 24 important to provide the residents of Arizona with a proper forum to litigate legitimate 25 disputes to enforce their legal rights. Thus, this factor does not eliminate jurisdiction with 26 respect to Eurocopter. See Yahoo, Inc. 145 F. Supp.2d at 1178 (noting that interest in giving 27 deference to French law "must be weighed against the United States own sovereign interest 28 in protecting the statutory and constitutional rights of its residents."). If this factor were

1  controlling, "it would always prevent suit against a foreign national in a United States court."
2  Id. (citing Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1333 (9th Cir. 1984)).

3  Lastly, although some of the potential witnesses regarding the manufacture and design of
4  the subject collective lock mechanism may be burdened by litigating this dispute in this
5  Court, this factor is by no means controlling.  Further, in light of modern advances in
6  technology and transportation, this burden may be reduced.  See Panavision Intern., L.P. v.
7  Toeppen, 141 F.3d 1316, 1323-24 (9th Cir. 1998).  It is also important to note that the
8  accident occurred in Arizona and presumably much of the physical evidence is located in
9  Arizona.

10  Thus, in balancing the Burger King factors mentioned above, this Court finds that it is
11  reasonable to maintain jurisdiction over these non-resident Defendants.

12  Because the Court finds that personal jurisdiction over these Defendants exists based upon
13  a specific jurisdiction analysis, the Court will not perform a general jurisdiction analysis and
14  makes no findings thereof.

15  **Accordingly,**

16  **IT IS HEREBY ORDERED** denying AEC's Motion to dismiss for lack of jurisdiction.
17  (Dkt. #10).

18  **IT IS FURTHER ORDERED** that Eurocopter's Motion to dismiss for lack of
19  jurisdiction is denied.  (Dkt.#29).

20  **IT IS FURTHER ORDERED** denying Plaintiff's Motion for conditional discovery as
21  moot.  (Dkt.#33).

22  DATED this 24th day of March, 2006.

_____
Mary H. Murguia
United States District Judge